**M. & J. TRACY, Inc. v. THE AMBOY et al.**

**THE LONG ISLAND.**

**THE GEFION.**

**THE ST. GEORGE.**

No. A–17969.

United States District Court
E. D. New York.

Dec. 15, 1950.

Supplemental Opinion Jan. 2, 1951.

634

Macklin, Speer, Hanan & McKernan, New York City, proctors for libellant (Martin J. McHugh, New York City, of counsel).

Burlingham, Veeder, Clark & Hupper, New York City, proctors for The Amboy and Pennsylvania R. Co. (Frederic Conger, New York City, and James W. Lynch, Brooklyn, N. Y., of counsel).

Haight, Deming, Gardner, Poor & Havens, New York City, proctors for The Gefion (Charles S. Haight and Gordon W. Paulsen, New York City, of counsel).

Galli & Locker, New York City, proctors for The St. George (William J. Magee, New York City, of counsel).

BYERS, District Judge.

The coal barge Long Island, while in tow upbound in the Arthur Kill, was struck on her port side about 30 feet from her bow by a descending tanker, The M/V Gefion, in the vicinity of Tremley Point, and decision is required to fix responsibility for that occurrence.

The date was May 19, 1945, at around 12:30 P.M., under clear weather conditions of good visibility, with no complicating factors of wind force or direction. The tide was flood of an estimated speed of from 1½ to 2 miles, meaning it was underfoot as to the tow.

The latter consisted of the barges Long Island fully laden with coal (about 1,000 tons) and The Grenada half laden similarly; they were made up abreast, The Long Island being to port, and they were in tow to the Pennsylvania steamtug Amboy, by steel cables to their outer corners, about 100 to 125 feet long.

Following astern was the steamtug St. George, having a seagoing barge made up alongside to port. The concensus of testimony is that she was about 600 feet astern of the Amboy tow, in about the middle of the channel, but perhaps heading to pass ahead eventually on the port hand of the Amboy tow, since the former was moving somewhat faster, but that intention, if entertained, did not take effect prior to this collision, and there had been no signals exchanged between these tows to announce such a purpose. Argument on this subject is pure conjecture, not supported by any testimony.

The Gefion was light, proceeding under her own power, and failed to round Tremley Point in her starboard side of the channel, but in making the effort to accomplish a port passing with the Amboy tow, she struck The Long Island as stated.

The owners of the latter filed a libel charging faults on the part of The Amboy and The Gefion, which the latter denied, and also impleaded The St. George and her owner, asserting faulty navigation on the part of that tug, as the cause of the collision. Thus the issues went to hearing, with amendments to the libel, not of

consequence, on the question of responsibility.

The Arthur Kill is a narrow channel (400 feet wide) running about north and south above and below Tremley Point which projects from the New Jersey side sufficiently to cause the channel to describe substantially a semicircle to the east, with a straight stretch at the top of about 300 yards constituting the frontage of the Point. This means that a descending ship turns almost 45° to her port off buoy 9 (Gefion Ex. A. U.S.C.& G.S.Chart 285), continues then straight ahead until off the mouth of Prall's Creek, where she turns to starboard about 22° and continues straight for about 300 yards; then she turns about 45° to starboard and continues straight ahead in that course until nearly to Carteret on the New Jersey side. The waters important to this cause comprehend that channel for a space of about 2,000 yards laid out therein northerly from the mouth of the Rahway River.

▮ The evidence is uncontradicted that The Gefion and the Amboy tow were each making from 5 to 6 knots over the ground before either was aware of the other; thus their approach was at the rate of 10 to 12 knots, The Gefion from the north and the Amboy tow from the south.

That was the condition when it became the duty of each to blow a bend whistle (Art. 18, Rule V, Inland Rules, 33 U.S.C.A. § 203) when arriving within one-half a mile of the bend around Tremley Point.

It will be convenient to consider the faults attributed to the tow by The Gefion, since it is concluded that she struck The Long Island because it was the latter that was damaged, and the witnesses for the ship do not assert the contrary; the testimony is that there was no damage to The Gefion's stem, which would be consistent with the impact having been delivered by that ship.

1. As to The Amboy's blowing a bend whistle as required:

Johansson, the tug's captain, McCabe, her pilot, not on duty but in the pilot-house, and Sepka, her first deckhand, also on duty, are convincing to the effect that The Amboy seasonably blew a bend whistle. The first says: "When about passing Rahway River I heard some signals on the other side of the point, but I couldn't see anything so I sounded a long blast on the whistle." The other two witnesses bear him out, and the only question is whether "off the Rahway River" was precisely one-half a mile from the bend. It could have been, or the reverse, but in any case it was not heard on The Gefion, according to her trial testimony. (Duncan's testimony at the Coast Guard hearing refers to a one-blast signal from The Amboy when he could see her, which was probably her port passing signal.)

▮ I think there was a reason for that, since the latter was exchanging a two-whistle starboard passing signal with a tug at the Sinclair dock as the ship approached the point, which may have interfered with attention to a possible bend signal from below. The further away that signal came from, the greater the chance of its not being heard, but I am satisfied that it was blown, and so find, and that it was at a sufficient distance below the bend to establish compliance on the part of the tug Amboy with the applicable Inland Rule.

The tow, which had been proceeding in mid-channel, at once sought the starboard side and got so far over that The Long Island was at that edge of the channel or beyond, when she was struck. That maneuver was consistent with the hearing of a Gefion bend signal, and the answering of it. The movement, McCabe says, was to buoys 6 (now 20) and 8 (now 22). It will be understood that it is necessary to either accept the Amboy testimony or reject it as inherently unconvincing, since there is nothing to controvert it in The Gefion's case. I observed nothing in the demeanor of the witnesses to discredit their testimony, but on the contrary was impressed with the probable truth of what they said.

This finding is not impaired by the argument that The Amboy's bend whistle was not sounded until The Gefion's two-blast exchange was heard, and therefore The Amboy was then less than one-half a mile from Tremley Point at which distance she

was required to sound her own bend signal. The argument is plausible but not convincing, since The Gefion's then position with reference to Tremley Point would not necessarily establish like datum as to The Amboy, because of The Gefion's changes in speed, and The Amboy's testimony above referred to, fixing her position when she heard the two-blast exchange as off the Rahway River, is accepted.

■ 2. As to The Amboy's being in mid-channel when off the mouth of the Rahway River:

That such was her position is her own testimony, and the finding is necessarily to that effect. To say that a fault is thereby established by no means follows. The custom of tows to seek the mid-channel strength of an underfoot tide is well known, and unless it should appear from the evidence that the tug could not swing her barges into the 200 feet which lay to her starboard, while moving upstream some 700 yards, nothing could be predicated of that condition. There is no disclosure to that effect. On the contrary, the showing is that, when The Long Island was struck, she had been towed so far to starboard that she was practically aground outside the channel in the shoal water directly south of Prall's Island. True, Duncan, The Gefion pilot, puts her in the channel, about 50 yards to the north of buoy 22 (8 in 1945), still however on the starboard side, but where the depth is 22 feet. On his own showing, therefore, she was in her own waters at the time of the collision, which means that The Gefion was not. It is unnecessary to pursue this topic and discuss whether The Long Island took ground at the collision, or was pushed by The Van Pelt 40 or 50 feet out of the channel before she settled; the Amboy tow was in its starboard side of the channel when the collision occurred, and so its position off the Rahway River played no part in this happening.

■ 3. The third fault argued for The Gefion is that The Amboy mishandled her towing hawsers, causing the port hawser to part. Such an incident took place. The Gefion's testimony is that the port hawser snapped and carried away just prior to the collision, while the Amboy witnesses, Johansson and McCabe, put it at impact or immediately thereafter. The cause is obscure but for present purposes the Gefion theory should be accepted, namely, that the brake controlling the starboard hawser on The Amboy had been "eased down" so as to "slack off" the starboard cable to promote a sheer by the tow toward the Staten Island shore. It can be reasoned that such a maneuver would tend to enhance the movement then under way which was sharply to starboard, by increasing the strain on the port cable and perhaps kinking The Grenada (the starboard barge) to act as a right rudder. It was not so explained and perhaps I have misunderstood the mechanics of the attempt. In any case it was explained by McCabe thus: "I stood by the hawsers to render whatever assistance I could do, and when it became apparent that a collision was going to take place I eased off the starboard hawser to allow more room between the bow of the Gefion, and the port hawser boat which was in our tow. * * * That was just a few seconds prior to the collision."

No finding can be made as to just when the port hawser gave way, but it was so close in point of time to the striking of the barge, that it is found not to have been the cause thereof.

The barge was 110 feet long, and the striking was not more than 30 feet aft of her square bow, therefore collision was not narrowly averted; the absence of strain on the port hawser in my opinion played no part in the episode.

Even if the starboard hawser should not have been eased at all, the effort to accomplish it was made in the moment of obvious peril and cannot be criticised because it proved to be ineffectual.

■ 4. The faults attributed to The St. George by The Gefion:

Since the latter filed the impleading petition, she undertook the burden of showing that the presence and navigation of The St. George caused or contributed to this collision. In that behalf, reliance is had upon the propositions: (a) that be-

low Tremley Point The St. George and her tow were on the New Jersey side of the channel; (b) that she did not blow a bend whistle at one-half a mile from Tremley Point; (c) that she did not blow a bend whistle on hearing the two-whistle exchange between The Gefion and the New York Central tug.

To sustain these contentions, the testimony of Duncan, pilot of The Gefion, and Van Pelt, captain of the tug of that name, is adduced, and the problem of appraisal is simplified, for no one was called by The St. George in view of the paucity of evidence to inculpate her.

As to Duncan, mention of The St. George and her barge occurs five or six times in his testimony, but not to the effect that the collision with The Long Island was caused or contributed to by the presence of those vessels. At page 137 he says that as The Amboy and tow came more into view he also saw another tug coming up with a sea-barge. At page 150, in connection with his maneuvers in view of The Amboy, he was asked about The St. George and said she was towards the center of the channel; "he might have been a little more to the Jersey side * * * a little off his (Amboy's) port quarter * * *." Those qualified observations would have to be weighed in connection with the necessary distortion of perspective due to the shape of the channel as shown by the chart, the position of The Gefion off the Sinclair dock, and the heading of that ship at these critical moments as revealed in Gefion Exhibits C, D & E.

It will be recalled that The Amboy and her tow were headed sharply to the Staten Island side, so that The St. George, unless she too were doing the same thing, would appear to be astern and also off the quarter of The Amboy tow, even though in the Staten Island side of the channel. Since Duncan does say how far astern The St. George was of the leading tow, his testimony falls short of establishing her then position in the channel. He does say (p. 149) that there came a time when he figured "I would never be able to make that bend around the channel and be able to go by the two tows".

Since we know that his ship struck The Long Island when the latter was near or at the far edge of the channel, this does not place the then position of The St. George, although by subsequent maneuvers a starboard passing was necessarily arranged and carried out because of the then position of The Gefion near to the damaged Long Island.

The testimony of Van Pelt covers the movements of his southbound tug, about 2,000 feet ahead of The Gefion, his observation of the Amboy tow when opposite the mouth of the Rahway River, and The St. George and her barge evidently astern, but at an undisclosed distance, and he says she was "approximately 125 feet off the Jersey shore", and that he passed her to port. Since the channel was 400 feet wide, and The St. George and her tow are assumed to have been about 50 feet over-all in width, it will be seen that, if Van Pelt is right, The St. George was little off the center line of the channel; it can be assumed for argument that she was, although the Amboy witnesses put her astern of that tow (as has been seen); there is yet no showing that her presence or navigation played any part in the collision, or contributed thereto.

There was no testimony for The Gefion that The St. George did not blow a bend whistle as the Inland Rule requires, but there is a suggestion that she did in this language of Johansson (p. 35):

"A. Oh, there was a tugboat behind me sounded one blast, I think it was him, I don't know.

"Q. A tugboat behind you sounded one blast? A. Yes."

■ It was the failure of The Gefion to negotiate Tremley Point, and the reasons for that failure, to which it is necessary to give attention, and the finding is that the presence of The St. George and her barge in the channel did not influence the maneuvers of The Gefion; and that the impleading petition must be dismissed for failure of proof.

■ *The handling of The Gefion:* This tanker was light, and drew 17 or 19 feet aft and either 8 or 11 feet forward, de-

pending on the agreement of counsel, or the testimony of Duncan at page 172.

Her dimensions were 505 feet by 63 feet by 36 feet, and her gross tonnage was 9,475. She had left Federal anchorage 28a and was bound for Port Socony, Duncan, the pilot, being on the bridge; he is in the employ of Dalzell, and held a master and pilot's license for these waters, and was the captain of the tug Aikman. She made her trip without incident until about to enter this reach of the channel. She had the assisting Dalzell tug Aikman (Van Allen, mate in charge) made fast, about 60 feet aft of her port bow, the tug intending to function at the docking of the ship. Thus the two vessels occupied about 83 feet of a 400-foot channel and were proceeding at about 5 or 6 knots over the ground, as estimated by Duncan, the ship's engines being at half ahead. Off Grasselli (Gefion Ex. A.) the ship blew a long bend whistle which was at the distance required by the Inland Rules. This is undisputed. At that time there was a New York Central tug moving upstream, having left a barge at the Sinclair dock on the New Jersey side; The Gefion blew two blasts to the tug for a starboard passing, which were answered and the passing was accomplished. It is a fair inference that this exchange of signals prevented Duncan or the ship's officers on the bridge with him (neither was called as a witness) from hearing The Amboy's bend whistle which is found above to have been sounded.

At about off buoy 9 The Gefion swung to her port as required and her engines were put in slow ahead. Her speed under such a movement is not stated. On the New Jersey side just ahead lay the oil barge which the New York Central tug had just berthed, and about 200 feet astern of her the tanker British Harmony, which projected into the channel some 60 feet, thus reducing its width to some 340 feet. The ship steadied in her new course and Duncan says she was 150 feet off the New Jersey side. If that is correct, he was then nearer Staten Island than New Jersey, having in mind the 83 feet width of the tanker and her tug. The engines being in slow ahead and The Gefion off the Sinclair dock,

Duncan saw The Amboy's stack showing beyond The British Harmony, below Tremley Point; he blew a long blast and stopped his engines, but of course did not lose his way.

The Gefion drifted along, watching The Amboy, and soon Duncan saw the latter's barges and also the St. George tow; he then put his engines full astern, and ordered The Aikman to shove ahead against the tanker's bow (this was about 100 feet north of the southerly mouth of Prall's Creek, p. 187), to make a sharp turn to starboard, and her helm was put in that position. These were intended "to push her (Gefion) around the bend", which was accomplished finally, but not until The Long Island had been struck and damaged as has been stated. The tanker of course gradually slowed down, but had not stopped at the time of collision which Duncan did not see; he observed that the port towing hawser of The Long Island let go at a time when he thinks his ship would have cleared the barge because he was just starting to get sternway and The Amboy was pulling its tow clear (p. 155); but on the next page he could not tell what the stern of the barges (barge Long Island?) did. He was given the chance to say that they (it?) sagged over into his bow, but stated that he could not tell about that.

Van Allen, the Aikman mate who was in charge of her, saw the snapping of the hawser and said: " * * * that had the occasion for the starboard hawser to pull the barges right into The Gefion's bow * * * as close as I could see."

It counts in favor of these witnesses that they did not attempt any positive statement on this subject, and obviously their preoccupation was not with gathering evidence for a lawsuit (which was destined not to come to trial for over five years for unexplained reasons), but rather with the handling of their respective craft.

Gefion Ex.C. is a sketch intended to show the shape of the tanker, her tug, and The Amboy and her tow, after the parting of the port hawser; it has not been explained, however, why if there was strain only on the starboard hawser at that time, the ef-

fect would not have been to haul both barges ahead at the starboard corner and cause the port corner to slack away and thus bring the stem of The Gefion nearer to the bow of The Long Island than 25 or 30 feet.

The upshot of The Gefion's testimony is that she was attempting to round Tremley Point while well in the Staten Island side of the channel, and failed to do so because of the obvious difficulty of bringing a 500-foot ship down partly athwart a 400-foot channel, having gotten into that position off the Sinclair dock where she learned that the Amboy tug was coming up, since Duncan saw her funnel over the top hamper of The British Harmony. Instead of coming to a stop at the earliest possible moment, Duncan seems to have assumed that the approaching tug had nothing in tow, because he could not at once see the barges. Since he was himself a tugboat captain, I should suppose he would have instinctively and promptly taken steps to bring his vessel into her own side of the channel. It will be borne in mind that, even if The Gefion had heard The Amboy's bend whistle, that would have told her nothing of the presence of the barges in her tow, or the length of the towing hawsers.

There is no testimony to the effect that The Gefion could not have stopped altogether, or have gotten close enough to the New Jersey shore to have avoided the collision, in the interval between her sight of The Amboy's stack and the moment of striking, but since the tanker's then position was about 600 yards from the place where she says The Long Island sunk, and during that interval the tow was moving at 5 knots, it seems fair to estimate that The Amboy was not less than 3,000 feet, or 6 ship's lengths, from The Gefion when the latter first knew of her presence in this channel. The interval which elapsed during which Duncan watched The Amboy, and permitted The Gefion to drift downstream before putting her engines astern, is not stated in terms of duration; it was obviously the time for taking such precautions as the attendant circumstances would suggest to the prudent navigator in circumscribed waters such as these. Whether long or short, the time was precious and was allowed to pass before The Gefion could be maneuvered out of a collision which was not forced upon her, but which she could have averted by proper handling. Thus her fault is established and because of it the libellant must have a decree against her.

No fault has been shown against The Amboy, as libellant's proctor conceded at argument.

There must be the usual interlocutory decree, with costs, against The Gefion; the libel is to be dismissed against The Amboy, with costs, and the impleading petition is dismissed without costs.

Findings are filed herewith.

Settle decree.

## Supplemental Opinion

Since the filing of decision herein, the libellant has made known its views that the second conclusion of law should be changed with respect to the award of costs against it on behalf of the tug Amboy which was found not to be at fault. Reliance is had upon M. McGirr Sons Co. v. Steamtug W. H. Flannery and Steamtug P. R. R. No. 9, 1925 A.M.C. 801; Burns Brothers v. Tanker Carteret and Steamtug Progressive, 1931 A.M.C. 1411, and Bouchard Transportation Co., Inc., v. Steamer Sandy Hook et al., 1939 A.M.C. 603. These causes were all decided in this Court and I was unaware of them, or of the disposition therein, so far as this District is concerned, of the question of costs where the towing vessel is exonerated, and another vessel is held liable for damages sustained by libellant's barge.

The reason for the award as made was the failure of libellant to adduce any testimony against The Amboy and the burden sustained by the latter in the presentation of its own cause. That seemed to sufficiently sustain the exercise of discretion which pertains to the court of instance in such matters.

Uniformity of administration, however, is more important than the views of

any one judge, and in deference to the decisions cited, which seem not to have been questioned in later cases here or elsewhere, it will be considered that a motion has been duly made to resettle the second conclusion of law, which will be granted, so as to provide that the libel is dismissed as against The Amboy, without costs.